1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLIN FORD,<br><br>          Plaintiff,<br><br>     v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>          Defendant. | Case No. 1:12-cv-00153-LJO-SMS<br><br>FINDINGS AND RECOMMENDATIONS<br>RECOMMENDING THAT THE COURT<br>AFFIRM DENIAL OF BENEFITS AND<br>ORDER JUDGMENT FOR COMMISSIONER |

        Plaintiff Marlin Ford, by his attorney, Sengthiene Bosavanh, seeks judicial review of a final

decision of the Commissioner of Social Security ("Commissioner") denying his application for

disability insurance benefits under Title II of the Social Security Act (42 U.S.C. § 301 *et seq.*) ("the

Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted,

without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.

Following a review of the complete record and applicable law, the undersigned finds the decision of

the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a

whole and based upon proper legal standards, and recommends that the Court affirm the

Commissioner's denial of benefits.

**I.      Procedural History**

        Plaintiff claims he has been disabled since May 8, 2007. On June 13, 2007, he applied for

benefits. The agency denied benefits, as did ALJ Sandra K. Rogers in an opinion dated May 29,

2009. The Appeals Council remanded. A second hearing occurred on March 23, 2011, before ALJ

Laura Speck Havens. Plaintiff appeared and testified. Also testifying were Stephen Schmidt, an impartial vocational expert, and Joseph Jensen, M.D., an impartial medical expert. On May 6, 2011, the ALJ denied Plaintiff's application. The Appeals Council denied review. Plaintiff appealed.

## II.   Factual Record

### A.   Plaintiff's Testimony

Plaintiff was born in 1962, educated through high school, and worked for the US Postal Service for 27 years. He became disabled in May 2007, when back, shoulder, and knee impairments made continuing work impossible. He also had hypertension and diabetes.

Plaintiff testified that he could handle most personal care, but he needed help with his socks sometimes. He could not help with chores, but sometimes cooked or accompanied his wife shopping. He slept during the day, maybe five hours at night, and watched football. He did not have a driver's license due to "tickets," but had applied for a new one. In terms of side effects of medication, he did not take Vicodin "too much" because it made him want to throw up. He told his doctor this but the dosage was not changed. His blood sugar was not controlled but he had not been hospitalized for diabetes.

He could walk or stand up to 45 minutes and sit up to 45 minutes at a time. He could "maybe" lift ten pounds. He had pain in his lower back, right shoulder and left knee. His knee pain felt like someone was stabbing him with an ice pick. He could not raise his arm overhead. He could reach in front of him but could not grab anything without his shoulder hurting. He had constant back pain. On average, with medication, his pain was 6 to 7 out of 10. His back pain extended to his left leg. He weighed 215 pounds, his normal weight. His diabetes caused dry mouth, so he drank and used the restroom a lot. He had diarrhea a lot which he treated with over the counter medication. This had been going on for a couple months. Because of pain, he had a marijuana card for a couple years, to help him sleep.

### B.   Medical Record

On April 8, 2002, an MRI of the lumbar spine revealed multilevel degenerative disc disease with disc bulge/protrusion from L5-S1, causing slight to moderate central stenosis. On April

25, 2006, an MRI of the lumbar spine revealed degenerative disc disease at L1-L2 through L5-S1 with disc herniation at L2-3 through L5-S1.

On April 13, 2007, Dr. Waters noted that Plaintiff reported "off and on" back pain. He said he had extreme pain for 2 weeks, but it was currently better. He denied radiation or numbness to his legs. On May 1, 2007, Plaintiff said he had been off work since April 20, 2007 due to low back pain. Dr. Waters noted that Plaintiff had seen a neurosurgeon "but neurosurgery was not an option at that time that he was first seen." The assessment was lumbar disc syndrome with chronic low back pain. On May 14, 2007, Plaintiff was now getting episodes of pain down the right leg. He could only work for four hours and then had to leave. Dr. Waters wrote, "I discussed the need for a more definitive approach to this problem. Advised that he needs to return to see a neurosurgeon at this time."

On May 23, 2007, Dr. Waters completed a report to the Federal Employees' Retirement System. In the report, he mentioned that Plaintiff had seen a neurosurgeon for his back. Plaintiff told the neurosurgeon that he was not in pain when he was off work, but work aggravated his pain. The neurosurgeon suggested he lose weight and continue physical therapy in an attempt to prevent surgery. Plaintiff was reluctant to consider surgery at that time and no further neurosurgical evaluation was forthcoming. In the report, Dr. Waters also discussed an MRI of the spine from March 2002. It showed a diffuse disc bulge narrowing the thecal sac, most severely at L5-S1. There was also a disc bulge at L3-L4 with arthritic changes in the facet joint. At L4-LS, the disc was slightly narrowed and appeared desiccated with the diffuse disc bulge in addition to a central broad-based disc protrusion. The conclusion was multi-level degenerative disc bulge protrusion from L2 to S1, causing slight to moderate central stenosis, most severely at the L5-S1 level. Since that time, Plaintiff "continued to have" intermittent back discomfort, which improved with rest and immobility but would reoccur with improper movements. His hypertension was controlled, but he was gaining weight progressively. Dr. Waters diagnosed lumbar disc syndrome, a herniated nucleus pulposus, labile blood pressure, and diabetes mellitus type 2. He concluded,

> [E]ach time that he returns to work, he is able to work only for a limited period of time before experiencing a reinjury to his back. Surgical intervention has been suggested as therapy, but at this time the patient has not been convinced that this is the route that he wishes to take. As a consequence, he misses many days of work and it is anticipated that if he

continues to have more episodes of back pain that his disability is going to become even more severe, resulting in probable neurologic damage to his lower extremities. At this time, I have asked that he stay off work, if at all feasible, until such time that his back symptoms subside. It may be of some benefit if a daytime type job would be available for him, in as much as the irregular or late hours that he works places an added burden on him because of the greater difficulty in controlling his blood sugars as a result of his diabetes mellitus. I do not see that he is able to return to any type of gainful employment in view of his current back status. Perhaps if he were to pursue a more aggressive course of therapy, which might include surgery, he could obtain some greater and prolonged relief of discomfort from his back, but there is no assurance that that can necessarily be assured at this time.

In an attached form, Dr. Waters stated that Plaintiff was disabled, but found "moderate limitation of functional capacity; capable of clerical/administrative or sedentary activity." Subsequent forms completed by Dr. Waters state that Plaintiff was precluded from performing any full time work, even at the sedentary exertional level.

On June 29, 2007, Plaintiff submitted a statement regarding his disability claim. He reported that he took his children to school, fed and watered pets, watched television, and took his children to football practice. He lifted dishes and grocery bags, went grocery shopping, drove for an hour, and pruned bushes. He slept seven hours. His activities were all limited by pain. He had diarrhea from medication. Food goes "right through" him. He said a doctor suggested that he have back surgery.

On September 29, 2007, Plaintiff had a consultative examination with Dr. Feng Bai, who is board-certified in Physical Medicine and Rehabilitation. Plaintiff drove himself to the exam. He reported that sitting, standing, walking, bending, and lifting increased his pain. Physical examination revealed that Plaintiff could sit and stand with a normal posture and there was no evidence of any tilt or list. He could rise from a chair without difficulty, and ambulated with normal gait. He had difficulty with tiptoe and heel walking. Range of motion of the lumbar spine was decreased due to pain. There was no pain with range of motion and axial rotation of the trunk. Straight leg raising test was negative bilaterally in the sitting position. Peripheral joints had full range of motion, as did the bilateral upper extremities except the right shoulder. The right shoulder had decreased range of motion due to back pain; however, ranges of motion of the shoulder were within normal limits. Impingement signs in the shoulders were negative bilaterally. There was diffuse tenderness at the lower lumbar paraspinal area and tenderness in the right front shoulder at the biceps tendon insertion area. Neurological examination revealed no focal weakness and normal sensation. He had 5/5

4

strength, although the right shoulder had mild give-way weakness. MRI studies of the lumbar spine indicated degenerative disc disease at L4-5, and L5-S1, disk protrusion, and facet arthropathy.

Based on his examination Dr. Bai concluded that Plaintiff could lift and carry 20 pounds occasionally, 10 pounds frequently, stand/walk up to six hours and sit for six in an eight hour workday, with postural limitations to include climbing, stooping, kneeling, and crouching, as well as limitation on the right shoulder to occasional overhead activity and avoiding very forceful pushing and pulling activities with the right hand due to biceps tendonitis. He wrote that Plaintiff also "needs to alternate sitting, standing, and changing position and for every two hours of constant standing and walking with constant sitting position."

On October 10, 2007, the non-examining State agency physician concluded that Plaintiff could perform light work, occasionally climb ramps or stairs, never climb ladders, ropes or scaffolds, and occasionally stoop, kneel, crouch or crawl. He had limited overhead use of the right upper extremity. He had to avoid even moderate exposure to vibration.

Chiropractic notes dated October 25, 2007 indicated Plaintiff's pain was 8/10. Standing, walking and sitting were "somewhat limited." On November 29, 2007, Dr. Waters noted that Plaintiff had tenderness on palpation of his lower spine. The assessment included chronic low back pain with a herniated disc by history.

On December 4, 2007 Dr. Waters completed a questionnaire in which he precluded Plaintiff from any full time work, even at a sedentary exertional level. He based this opinion on the impairments of herniated lumbar disc, lumbar radiculopathy, diabetes, and hypertension. He felt that Plaintiff could sit 2 hours intermittently and stand or walk up to 2 hours in an 8-hour workday. He felt that Plaintiff met the requirements of "Listing l.04."

On January 31, 2008, Dr. Waters noted that Plaintiff continued to report back pain. He said his back was "giving him more problems" because he had been trying to walk to lose some weight. He said that he was still could not work because of his back. On February 6, 2008, Dr. Waters completed another form indicating that Plaintiff was incapable of even sedentary work. On February 29, 2008 Dr. Waters noted that Plaintiff "continues to have low back discomfort. This is bothersome, but he is addressing it with increased activity with walking in an attempt to lose weight." A TENS

1  unit was prescribed for "low back strain with chronic pain." On March 24, 2008 Dr. Waters

2  completed another form indicating that Plaintiff was incapable of even sedentary work.

3        On April 8, 2008, Dr. Waters saw Plaintiff in regard to a persistent cough. No mention of

4  back pain was noted. The only pain medication was Ibuprofen 800 mg. On April 30, 2008, Plaintiff

5  saw Dr. Waters in regard to a sore throat and cough. Upon examination, he had pain on flexion of

6  the left leg at the hip and knee. The assessment was bronchitis, chronic low back pain and lumbar

7  disc syndrome. On May 1, 2008, Dr. Waters completed another form indicating that Plaintiff was

8  incapable of even sedentary work.

9        On June 2, 2008, Plaintiff was in no acute distress. An x-ray of the right shoulder dated June

10  2, 2008 revealed no evidence of fracture or dislocation. An inferior spur of the acromion was noted

11  which "can cause impingement syndrome." Clinical correlation was suggested. On June 12, 2008

12  Dr. Waters completed another form indicating that Plaintiff was incapable of even sedentary work.

13        On August 25, 2008, Plaintiff had an initial visit with Dr. Lan, a Veterans' Administration

14  doctor. Plaintiff told Dr. Lan that his back was first injured in 1985, when he was in the Air Force. A

15  500-pound door swung shut on his back, injuring two lumbar discs. In addition to back pain,

16  Plaintiff described intermittent associated lower extremity symptoms consisting of numbness and

17  tingling which primarily involves the back of his leg. His right shoulder also bothered him. He was

18  diagnosed with diabetes about two years ago and was trying to lose weight. He reported regular

19  physical activity of 30 minutes 3 or more times a week. He was prescribed Ibuprofen and Vicodin.

20        On September 5, 2008, Dr. Waters opined that Plaintiff had severe limitation of functional

21  capacity, and was incapable of minimal, sedentary activity. His disability was "stable and static."

22        On October 23, 2008, Plaintiff saw Dr. Lan after reporting an exacerbation of his

23  back pain, including some lower left extremity radiculopathic symptoms initially. Neither Ibuprofen

24  nor Vicodin relieved the symptoms. A topical analgesic provided some relief. He experienced

25  muscle tension particularly when changing position after staying immobile for a while such as when

26  getting out of the car. His shoulders were also bothering him, and interfered with sleep. Ibuprofen

27  was switched to Naproxen, and Tramadol was added for back pain.

28

6

On December 12, 2008, an x-ray of the lumbar spine revealed multilevel degenerative joint disease at multiple levels, with most pronounced findings at L3-4, along with hard disc changes at L2-3, L3-4, and L4-5. Plaintiff was examined by Dr. Kaplan in regard to his request for increase in disability pension on December 15, 2008. Plaintiff said that he could not lift, perform grocery shopping, or drive for longer than one half hour. He rated his baseline pain as 5 to 6 out of 10, increasing up to 9. Medication during these flares consisted of Vicodin. He reported radiation to his left leg, but denied weakness or sensory disturbance, although he said he had occasional paresthesias in his hands. He took Ibuprofen 3 to 4 times a week. He could no longer ride motorcycles, or play sports. He estimated that he could walk for one half mile for half an hour. He said he was independent in activities of daily living, but once or twice a week his wife might help him with donning his socks. Upon physical examination he had mild tenderness to palpation in the lower lumbar paraspinal muscles, but he had no muscle spasm and no tenderness over the spine. Strength was 5/5. "Give-way" weakness was noted, and he needed encouragement to give full effort. Range-of-motion testing of the thoracolumbar spine indicated no change on range of motion following three repetitions. He could walk on heels and toes and there was no pronator drift. Deep tendon reflexes were bilaterally symmetric and diminished and absent at the ankles. There was no radicular sensory loss. Dr. Kaplan's assessment was multilevel degenerative joint disease with herniated disc but normal neural foramina, and likely diabetic neuropathy.

On January 21, 2009, Plaintiff was seen by Dr. Lan for a follow-up. He said that he had been sick and had slept for five days. He developed back pain from "all the lying in bed." He also reported left leg symptoms. Naproxen, Tramadol and Vicodin were continued for back pain.

At the first ALJ hearing, on January 26, 2009, Plaintiff testified that he drove daily, approximately 10 to 15 times a week. He drove his children to school, and drove to the doctor and to the store. He could not work because of back pain, diabetes, high blood pressure, "wore out" shoulders and ringing in the ears. Medications made him dizzy. He said that he told his doctor about this. Activities included feeding dogs, chickens, and geese. He tried to walk and watched television.

On June 11, 2009, Plaintiff saw Dr. Lan for a follow-up visit. Until two weeks prior, he had had mid-back pain which lasted six weeks. Dr. Lan assessed that his diabetes had much room for

improvement. Naproxen, Vicodin, Ultram and Robaxin were continued for back pain. He was told to return in five months. However, Plaintiff did not see Dr. Lan again until June 17, 2010, after an "extended hiatus." Plaintiff complained of medial knee pain and swelling over the past six weeks. Wearing a brace initially helped, but after a while worsened the symptoms. Ibuprofen may have helped. He also had tingling in his toes. He had low back and shoulder pain. He had lost weight initially, but stopped exercising due to pain and regained it. He weighed 225 pounds. The assessment was that his diabetes needed improved control, his hypertension was controlled, and Naproxen and Vicodin were continued for back pain. With regard to his knee, he was told to take Naproxen regularly, and he was given instructions for exercises. His foot symptoms were possibly related to neuropathy, though "not typical given asymmetrical involvement."

On July 2, 2010, Dr. Brubaker completed a medical marijuana authorization for Plaintiff. On August 5, 2010, Plaintiff saw Dr. Lan for an intermittent, "shooting" left knee pain. Naproxen did not relieve his symptoms and Ibuprofen had marginal effect. He also reported tingling of his left foot at night. The doctor considered pes anserine bursitis. Based on the superficial tenderness, he ruled out the joint. Plaintiff declined a crutch or cane for support. Diclofenac was started.

Plaintiff underwent an orthopedic evaluation performed by Dr. Johnson on October 17, 2010. He denied any focal weakness of the lower extremities. He weighed 222 pounds. His gait was left sided antalgic but he did not use a cane. Sensation was diminished at the toes. Grip strength was up to 50 pounds on the right, 60 pounds on the left. Range of motion of his shoulders was within normal limits, with generalized tenderness at the subdeltoid bursa. Range of motion of his neck, elbows, wrists and fingers was normal. Mild crepitus was noted of the left knee, but range of motion was normal. Straight leg raising was negative. He had some baseline decreased sensation in his toes. He could rise and get on and off the exam table without difficulty. Motor strength was 5/5 in all extremities. It was noted that MRIs had revealed multilevel degenerative joint disease and disk disease without severe foraminal narrowing.

Dr. Johnson diagnosed chronic lumbago, probable diabetic neuropathy, left knee pain, right shoulder pain, and obesity. He could lift or carry up to 20 pounds occasionally, 10 pounds frequently, and sit, stand or walk up to 6 hours in an 8 hour day, but no more than one hour at a time.

8

He could occasionally reach with his right upper extremity and occasionally use foot controls. He could occasionally climb, balance, stoop, kneel, crouch or crawl. He could never work at unprotected heights, or around moving machinery, mechanical parts, or operate a motor vehicle. He could never be exposed to extreme temperatures due to use of medication.

On December 2, 2010, Plaintiff saw Dr. Lan. His right elbow hurt over the last week. It hurt to try lifting anything as heavy as a gallon of milk. Plaintiff reported that a civilian physician diagnosed him with a torn meniscus in his left knee. Upon examination, tenderness was noted at the right lateral epicondyle. His feet had no edema. Sensation was perceived but not distinct. Plaintiff's diabetes was poorly controlled, and he was told that if he could not expend calories through physical activity, he would need to reduce caloric intake. His hypertension had a "fair reading." Diclofenac and Vicodin were continued for back pain. Plaintiff declined a knee MRI, stating that he did not want a conventional MRI machine but an open one. An elbow band was ordered for his lateral epicondyle. He was told to return in 6 months.

**C.    Testimony of Dr. Jensen**

Dr. Jensen, the medical expert at the hearing, testified that Plaintiff had diabetes with some evidence of lower extremity neuropathy. He had low back pain, caused by degenerative disc/joint disease, without significant radiculopathy. An MRI from 2002 showed an L5-S1 level 9mm disc bulge that did not appear to be significantly compromising a neuroelement. Plaintiff had evidence of a left knee internal derangement with no surgery. He had evidence of right shoulder tendonitis, with limitation of motion. He did not meet or equal any listing.

Dr. Jensen generally agreed with the limitations stated by Dr. Bai and found that the medical evidence did not support the limitations described by Dr. Waters. Plaintiff could lift or carry 10 pounds frequently, 20 pounds occasionally. He could stand or walk up to 2 hours combined, and sit 6, in an 8 hour workday. He noted that Plaintiff declined any surgical intervention on his knee. His obesity, a BMI of 36, precluded ladders or unprotected heights as a prophylactic matter. His right shoulder problem precluded reaching at or above shoulder level. "And as far as manipulation or use of his upper extremities bilaterally, in my opinion, could be frequent." Plaintiff could occasionally perform postural activities, but was precluded from crawling.

9

1

### D.    Testimony of Vocational Expert

Mr. Schmidt testified as the vocational expert. He stated that Plaintiff had a work history of mail handler (light, 4), heavy as performed.[1] Mr. Schmidt then assumed a person of Plaintiff's age (49), education (high school), and work history, and considered several hypotheticals involving this person's residual functional capacity ("RFC"). *Cf.* 20 C.F.R. §404.1560(c)(1).

In the first RFC, the person could sit six hours, stand two hours, and walk two hours out of eight; could lift and carry 20 pounds occasionally, 10 frequently; could climb stairs occasionally, ladders never; could occasionally bend, stoop, kneel, and crouch, but never crawl; could do no overhead reaching with the right upper extremity; and must avoid exposure to heights. Mr. Schmidt stated that the person would not be disabled. Although he could not perform Plaintiff's past work, he could do representative occupations such as assembly (sedentary, 2—4,000 jobs in California), information clerk (sedentary, 2—11,000 jobs in California), or order clerk (sedentary, 2—19,000 jobs in California).

In the second RFC, the person also was limited in both arms to handling, fingering, and feeling only frequently. Mr. Schmidt testified that this additional limitation precluded the assembly and order clerk jobs, leaving the information clerk job.

In the third RFC, the person was further limited in that he needed to take a break every hour. Mr. Schmidt testified that there would be no work for the person.

### III.    The ALJ's Decision

The ALJ found that Plaintiff had not met his burden under the Act to show that he was disabled. Pursuant to 42 U.S.C. § 1382c(a)(3)(A), to be disabled, a claimant must be unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. In explaining her decision, the ALJ followed the five-step sequential analysis as required under 20 C.F.R. §§ 404.1520 (a)-(f):

---

[1] Each job title is followed by a strength rating and a Specific Vocational Preparation number in parentheses. The strength rating captures the physical demands and frequency of certain basic activities. The frequency may be "never," "occasional" (up to one-third of the workday), "frequent" (from one-third to two-thirds), or "constant" (two-thirds or more). The Specific Vocational Preparation ranks, from one to nine, the time required to learn facility in the job. *See* Dictionary of Occupational Titles (4th ed.1991) Appendix C.

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

Plaintiff had not engaged in substantial gainful activity since May 28, 2007. His severe medically determinable impairments were diabetes, obesity, degenerative disc disease, degenerative joint disease, left knee internal derangement, and right shoulder tendonitis. Other impairments were not severe—tinnitus, hypertension, and a non-united wrist fracture. His impairments, singly or in combination, did not meet or equal any listed impairments. Plaintiff had the RFC described in the vocational expert's first hypothetical. This person could not do Plaintiff's prior work, but he could do the other work described by the vocational expert. Plaintiff was thus not disabled at Step Five.

## IV.   Discussion

### A.   Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. This Court must uphold the decision if the ALJ applied the proper legal standards and made findings supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla," *id.,* but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). The record as a

11

1  whole must be considered, weighing both the evidence that supports and the evidence that detracts

2  from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). If the

3  evidence can reasonably support either affirming or reversing the Secretary's conclusion, the Court

4  may not substitute its judgment. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.1996).

5            **B.**    **The ALJ Gave Sufficient Reasons to Reject the Opinion of Dr. Waters**

6         Dr. Waters, a treating physician, opined that Plaintiff needed irregular work hours and

7  irregular breaks: He needed to lie down three times per day for 30 minutes at a time, and could sit

8  for two hours intermittently and stand and/or walk for one to two hours in a workday.[2] The Appeals

9  Council remanded the first ALJ decision for a more detailed discussion of this opinion. Plaintiff

10  argues that the second ALJ decision again gave insufficient reasons for rejecting this opinion.

11         Here, Dr. Waters's opinion was contradicted by other medical opinions and evidence.

12  Accordingly, it was not controlling, and the ALJ could reject it for "specific and legitimate reasons"

13  supported by substantial evidence in the record. *Orn v. Astrue*, 495 F.3d 625, 632-33 (9th Cir. 2007).

14  The factors that the ALJ could consider include (1) the examining relationship; (2) the treatment

15  relationship, including (a) the length of the treatment relationship or frequency of examination, and

16  the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5)

17  specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. §

18  404.1527(d). When considering supportability, a medical opinion may be disregarded to the extent

19  that it is premised on the claimant's discredited complaints. *Morgan v. Comm'r of the Soc. Sec.*

20  *Admin.*, 169 F.3d 595, 602 (9th Cir.1999).

21            **1.**    **Plaintiff's Credibility**

22         Despite Plaintiff's testimony of disabling pain, the ALJ found him "not entirely reliable." Dr.

23  Waters relied in part on Plaintiff's subjective reports. Plaintiff's credibility was thus highly relevant,

24  not merely in evaluating Plaintiff's symptoms, but also in evaluating Dr. Waters's conclusions.

25

26

---

27  [2] Although Dr. Waters did not explicitly state the cause of this limitation, the RFC questionnaire suggests that he viewed spinal problems as the cause. There is evidence that Plaintiff's diabetes might also have required frequent breaks—at the first ALJ hearing, Plaintiff said he needed to urinate hourly—but two years later, Plaintiff offered very little evidence of

28  the problem as it stood then, despite posing a hypothetical that seemed to have bathroom breaks in mind. AR 51, 62, 75. On appeal, Plaintiff does not raise bathroom breaks as an issue with the ALJ's RFC finding.

To reject a claimant' symptom testimony—absent affirmative evidence of malingering, and assuming his impairments could reasonably give rise to his reported symptoms—the ALJ must make specific credibility findings supported by clear and convincing reasons. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006); *Schow v. Astrue*, 272 F. App'x 647, 654 (9th Cir. 2008). An ALJ may engage in ordinary techniques of assessing credibility. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005).

First, the ALJ noted that, despite testifying to disabling pain, Plaintiff did not see a physician from June 11, 2009 through June 17, 2010. There was no explanation for this year-long lack of treatment. Plaintiff may have used "medical" marijuana during this time, but he did not receive his marijuana authorization until July 2010. (Plaintiff's use of marijuana also raised credibility issues. In October 2010, he told a consultative examiner that he did not smoke or use drugs. If this was a false statement, then he misled the examining doctor; if true, then his pain issues were less severe than he told the ALJ.) This "extended hiatus" from treatment was particularly troubling to the ALJ because at the June 2009 appointment, Dr. Lan told him to follow up in five months. A similar disconnect occurred in May and November 2007. Dr. Waters advised Plaintiff to see a neurosurgeon in regard to his lumbar spine, but there is no indication that Plaintiff ever followed his recommendation. Also in November 2007, Plaintiff had an appointment to see a doctor regarding his back, but there is no evidence that he kept the appointment. Plaintiff also seemed to embellish his limitations, exhibiting "give-way" weakness and needing encouragement to give full effort.

The ALJ also properly identified inconsistencies in Plaintiff's statements regarding his activities of daily living. On June 29, 2007 he indicated that he drove his children to school, fed his animals, took his children to football practice, went grocery shopping, pruned bushes, drove for up to an hour, and could lift dishes and groceries. On August 25, 2008 he reported regular physical activity of 30 minutes 3 or more times a week. Yet on December 15, 2008 he said he could not drive for more than a half an hour, grocery shop, or do any lifting. At the same time, he could walk a half mile or a half hour, and was independent in activities of daily living, aside from occasional help putting his socks on. At the first ALJ hearing on January 26, 2009, Plaintiff reported that he drove up to 15 times a week, including to the store. He fed his pets and picked his children up from school. At

the hearing on March 23, 2011 he denied doing any household chores but occasionally cooked. He was not driving, but only because his license was suspended. The inconsistencies between these various reports properly caused the ALJ to doubt Plaintiff's descriptions of the limiting effects of his pain. The ALJ also added his own observation of Plaintiff at the hearing, which—consistent with "numerous" notes by Drs. Bai, Waters, and Lan—showed Plaintiff as appearing in no acute distress. Plaintiff did not appear to be in pain, and his testimony was not consistent with a person with allegedly disabling impairments.

The ALJ also identified credibility issues with Plaintiff's medication history. In September 29, 2007, Plaintiff was taking only over-the-counter pain medication. A year later he was prescribed Ibuprofen and Vicodin. Over nearly four years, despite some changes in Plaintiff's medication, the ALJ observed that Plaintiff continued his medication with "minimal adjustment," taking Vicodin during pain "flares." These observations suggested to the ALJ that Plaintiff's pain was relatively controlled with medication. Regarding the side effects of his medication, Plaintiff told the Social Security Administration on one occasion that medication went "right through" him, on another occasion that it made him dizzy, and on another occasion that it made him throw up. But there was no evidence that his medications had been adjusted for any of these reasons. Accordingly, the ALJ properly relied on the fact that Plaintiff's complaints as to side effects conflicted with the record.

### 2.    <u>Reliability of Dr. Waters's Opinion</u>

Dr. Waters's opinion is also unreliable in light of the factors described in 28 C.F.R. § 404.1527(d). Plaintiff points to the fact that Dr. Waters has a strong examining and treating relationship with Plaintiff. Indeed, as Plaintiff's treating physician from 1986 through 2011, he has a longitudinal knowledge of Plaintiff's medical history. In general, greater weight is accorded to the opinion of a treating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Sprague v. Bowen,* 812 F.2d 1226, 1230 (9th Cir.1987). Still, it is an error to give an opinion controlling weight simply because it is the opinion of a treating source, if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record. SSR 96-2p. Other doctors did not identify the limitations that Dr. Waters identified, including Drs.

Bai, Johnson, Jensen, and a state agency physician. Two of these doctors (Bai and Johnson) examined Plaintiff. Specialization is another relevant factor. Drs. Johnson and Jensen have relevant specialization as orthopedists, and Dr. Bai is board-certified in Physical Medicine and Rehabilitation. Dr. Waters, a general practitioner, appeared to acknowledge his own limitations when he advised Plaintiff to see a neurosurgeon, in May and November 2007.

The ALJ also took issue with the supportability and consistency of Dr. Waters's opinion. For example, in May 2007, Dr. Waters's report indicates that "surgical intervention has been suggested as therapy," when in fact there was no such evidence from a surgeon to indicate that surgery was warranted. AR 31. In fact, Dr. Waters acknowledged that the neurosurgeon suggested weight loss and physical therapy to prevent surgery. AR 271. Also, four other doctors found, contrary to Dr. Waters, that Plaintiff could lift or carry up to 20 pounds occasionally, 10 frequently. The ALJ found their conclusion more plausible, noting that Plaintiff had "normal neural foramina without compromise of a neuro-element." AR 32. Similarly, in a single report from May 2007, he suggested a daytime job would be more appropriate for Plaintiff; stated that Plaintiff was not capable of any type of gainful employment; and, in an attached form, stated that Plaintiff was capable of clerical or administrative type work. Subsequent forms precluded all work, yet the treatment notes did not indicate substantial worsening of his conditions. These issues with support and consistency contributed to the substantial evidence for rejecting Dr. Waters's opinion.

### C.   The ALJ Properly Considered Dr. Bai's Opinion

Based on an orthopedic consultative exam in September 2007, Dr. Bai opined that Plaintiff could stand, walk, and sit for six hours in an eight-hour day. Dr. Johnson shared this opinion. However, Dr. Bai added that Plaintiff also "needs to alternate sitting, standing, and changing position and for every two hours of constant standing and walking with constant sitting position." Although Dr. Bai clearly meant to limit Plaintiff to two hours of standing or walking at a time, it is unclear whether that limit applies to the activities individually or taken together. Plaintiff argues that the ALJ "misread" Dr. Bai's limitations and should have remanded to have them clarified.

While it is true that Dr. Bai's limitations are written ambiguously, there is no need to remand to have the opinion clarified. The ALJ did not rely on Dr. Bai's opinion; instead, she noted that Dr.

Jensen stated that his opinion was corroborated by Dr. Bai's opinion, and she found that the evidence did not support Dr. Jensen's opinion (that Plaintiff could stand for or walk for up to two hours combined), but instead supported the conclusion that Plaintiff could stand and walk for two hours each. Her decision to reject Dr. Jensen's opinion incorporated her adverse credibility finding. By rejecting Dr. Jensen's opinion on this point, she addressed and properly rejected Dr. Bai's opinion as well.

### D.        Failure to Consider Manipulative Limitations Was Harmless Error

At the hearing, Dr. Jensen described the limitations in Plaintiff's arms as follows: "With his right shoulder I would preclude him from reaching at or above shoulder level. And as far as manipulation or use of his upper extremities bilaterally, in my opinion, could be frequent." AR 58-59. The ALJ summarized this testimony as follows: "He is precluded from reaching at or above shoulder level. He can frequently use his bilateral upper extremities." AR 30.

This was error. Dr. Jensen stated a "manipulation" limitation, a term which refers not only to reaching, but also to handling, fingering, and feeling. SSR 85-15. One could argue that Dr. Jensen only had reaching in mind. This reading is supported by the context, is consistent with all the other expert opinions, and is contradicted only by a single reference to hand paresthesias in December 2008. However, because Dr. Jensen's testimony was ambiguous, it was the ALJ's responsibility to seek clarification. As she did not do so, the ALJ erred by not considering Plaintiff's "manipulation" limitation to include handling, fingering, and feeling.

Defendant maintains that this error was harmless. Error is harmless where it is clear from the record that it was inconsequential to the ultimate nondisability determination. *Tommasetti v. Astrue,* 533 F.3d 1035, 1038 (9th Cir.2008). Although the ALJ failed to consider whether Plaintiff had this limitation, the vocational expert did consider it, and opined that it would not stop someone with Plaintiff's background and other limitations from doing all work. Specifically, he could perform 11,000 positions in California as an information clerk. Under the Act, then, Plaintiff would have not been disabled—and the ALJ's error would have been harmless—if these 11,000 positions constituted "significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c (a)(3)(B). This is a question of fact, *Barker v. Sec'y of Health &*

*Human Services*, 882 F.2d 1474, 1480 (9th Cir. 1989), and the burden of establishing work in "significant numbers" lies with the Commissioner. *Beltran v. Astrue*, 700 F.3d 386, 388-89 (9th Cir. 2012). Nevertheless, courts routinely find harmless error even when the ALJ never made a finding as to whether the available jobs represented a "significant number." *See, e.g., Allison v. Astrue*, 425 F. App'x 636, 640 (9th Cir. 2011); *Jenkins v. Astrue*, 815 F. Supp. 2d 1145, 1154 (D. Or. 2011).

The Ninth Circuit has never set out a bright-line rule for what constitutes a "significant number" of jobs. *Beltran*, 700 F.3d at 389-90. Although *Beltran* suggests that courts make comparisons with cases that have found numbers to be "significant" or "not significant," most cases deal with numbers of jobs available "regionally;" few involve estimates of jobs available in California. *Eckard v. Astrue*, 2012 WL 669895 (E.D. Cal. Feb. 29, 2012). Nevertheless, district court and unpublished circuit cases agree that fewer than 11,000 jobs in California represent a significant number. *See Chopp v. Colvin*, 2013 WL 1120085 (C.D. Cal. Mar. 18, 2013) (2,200 in California); *Bodick v. Massanari*, 15 F. App'x 428, 430 (9th Cir. 2001) (2,000 in Los Angeles, or 3,000 in California); *De La Cruz v. Astrue,* 2009 WL 1530157, *10 (E.D.Cal.2009) (2,756 in California).

In *De La Cruz*, the court also noted that it was highly significant that there was "nothing to suggest that the positions were either isolated or existed in relatively few locations." *Id*. The court cited a Seventh Circuit case which held that claimants could not be expected to do such jobs, because the purpose of the "significant numbers" provision is to ensure that there are jobs "in reasonable proximity" to where the claimant lives. *Barrett v. Barnhart*, 368 F.3d 691 (7th Cir.2004). Rejecting the Commissioner's finding of nondisability based solely on numbers of jobs available nationwide, the Seventh Circuit pointed out that vocational experts generally testify regarding jobs available in an area either the size of the state or smaller than the state. Here, there is nothing to suggest that the 11,000 information clerk jobs available to Plaintiff are either isolated or exist in relatively few locations. While the state of California may be a large state, *Barrett* suggests that the state is an appropriate unit for defining "reasonable proximity." [3] Thus, the 11,000 jobs available in California represent a significant number of jobs. The ALJ's error was harmless.

---

[3] Based on the Court's survey of a legal database, it appears that while vocational experts in the Eastern District of California tend to cite jobs state-wide, those in the Central District prefer to cite a region such as "Los Angeles County." Absent briefing by the parties on the point, the Court simply observes that in California, much of the Eastern District is in fact more "central" than the Central District. This potentially opens more of the state to job-seekers.

**V.    Conclusion**

A review of applicable law and facts indicates that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the undersigned recommends that the District Court affirm the Commissioner's determination.

These Findings and Recommendations will be submitted to the Honorable Lawrence J. O'Neill, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1). On or before **THIRTY DAYS from the entry of this order,** any party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that, by failing to file objections within the specified time, he may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **April 10, 2013**                        **/s/ Sandra M. Snyder**
                                                    UNITED STATES MAGISTRATE JUDGE